Diana SWORD and Carl Sword, Jr., Appellants (Plaintiffs Below),

v.

NKC HOSPITALS, INC., Alliant Health System, Inc. d/b/a Norton's Children's Hospital, Appellee (Defendant Below).

No. 10S05-9610-CV-637.

Supreme Court of Indiana.

June 25, 1999.

Derrick H. Wilson, Mattox & Mattox, New Albany, Indiana, for appellants.

David C. Jensen, Paul A. Rake, Lyle R. Hardman, Eichhorn & Eichhorn, Hammond, Indiana, Amicus Curiae The Insurance Institute of Indiana, Inc., for appellee.

James M. Gary, Weber & Rose, P.S.C., Louisville, Kentucky, for appellee.

N. Kent Smith, Hall, Render Killian, Heath & Lyman, P.C., Indianapolis, Indiana, Amicus Curiae Indiana Hospital & Health Association, for appellee.

ON CIVIL PETITION TO TRANSFER

SELBY, J.

Norton's Children's Hospital ("Norton" or "defendant") challenges the decision of the Court of Appeals which reversed the trial court's decision granting summary judgment for Norton in this medical malpractice action. *Sword v. NKC Hosp., Inc.,* 661 N.E.2d 10 (Ind.Ct.App.1996). Specifically, the trial court ruled on a choice of law question that it was bound to apply Indiana law rather than the law of Kentucky. The trial court then held that, as a matter of law, Norton could not be held liable for the injuries to patient Diana Sword ("Sword" or "plaintiff") because plaintiff asserts that she was injured through the asserted negligence of an independent contractor physician who practiced at Norton. Finally, the trial court held that, on the record before the court, there was no genuine issue of material fact as to whether the physician's negligence caused Sword's injuries. The Court of Appeals reversed and held that, under the doctrine of apparent or ostensible agency, Norton could be held liable for the alleged negligence of its independent contractor physician, and that the record established material issues of fact both

on the question of apparent agency and causation. *Id.* at 17.

We previously granted Norton's petition for transfer and now address the following issues: 1) whether the trial court erred in resolving the choice of law question by applying Indiana rather than Kentucky law; 2) whether an application of the doctrine of apparent or ostensible agency is appropriate and warrants a conclusion that there are genuine issues of material fact in dispute on that issue; and 3) whether there is a genuine issue of material fact as to causation. Although we conclude that the trial court correctly resolved the choice of law question, the trial court erred when it concluded that, as a matter of law, Norton was not liable to Sword because an independent contract physician assertedly committed the negligent acts and because the record did not establish material issues of fact on the question of causation. Accordingly, we reverse the trial court's grant of summary judgment in favor of defendant on the apparent agency and causation issues and remand for further proceedings not inconsistent with this opinion.

## FACTS

The facts taken in the light most favorable to the non-moving party are as follows. Diana Sword lives in southern Indiana. On April 24, 1991, Diana Sword and her husband entered Norton in Louisville, Kentucky for the delivery of their first child. Prior to entering the hospital, Sword consulted with her obstetrician about whether or not to deliver with the help of an anesthetic. Her obstetrician recommended using an epidural; he told Sword that the epidural procedure would numb her from the waist down, and that he used them frequently. Sword decided to have an epidural. She, however, did not know in advance who would administer the epidural.

Sword also made arrangements to go to Norton through her obstetrician's office. Norton aggressively marketed its services to the public. It stated in brochures that its Women's Pavilion is "the most technically sophisticated birthplace in the region." (R. at 228.) Norton also advertised that it offers:

[I]nstant access to the specialized equipment and facilities, as well as to physician specialists in every area of pediatric medicine and surgery. Every maternity patient has a private room *and the full availability of a special anesthesiology team, experienced and dedicated exclusively to OB patients.*

*Id.* (emphasis added). One brochure stated that:

The Women's Pavilion medical staff includes the only physicians in the region who specialize exclusively in obstetrical anesthesiology. They are immediately available within the unit 24 hours a day *and are experts in administering continuous epidural anesthesia.*

(R. at 232.) (emphasis added).

At some point during her labor, an anesthesiologist came into Sword's room. He explained the epidural procedure and how it would make her feel. He told her that he would stick the tubing for the epidural in her lower back and then she would feel numbness from the waist down. As the anesthesiologist was preparing to begin the procedure, he was called out of the room.

Five to ten minutes later, a second anesthesiologist, Dr. Luna, came into Sword's room to administer the epidural. The parties do not dispute that Dr. Luna practiced medicine at Norton as an independent contractor. After verifying that the previous anesthesiologist had explained the procedure to Sword, Dr. Luna began the epidural procedure. As Sword sat on the bed and leaned forward, Dr. Luna began inserting the epidural tubing. Dr. Luna first inserted the tubing near the top of Sword's neck. Shortly thereafter, Dr. Luna removed the epidural tubing "because it did not take" and then reinserted it in Sword's lower back. (R. at 181–82.)

Soon after the delivery of her healthy baby, Sword began to have headaches which recur every four to six weeks. When the headaches occur, Sword is very sensitive to light and sound. In addition to the headaches, she also feels a numbness in her back where the second epidural was administered. Sword alleges that these symptoms are a

result of Dr. Luna's negligent placement of the epidural tubing and that Norton is liable.

## I. Standard of Review

To determine whether the trial court correctly granted summary judgment, this Court applies the same standard as did the trial court. *See Trotter v. Nelson,* 684 N.E.2d 1150, 1152 (Ind.1997); *Greathouse v. Armstrong,* 616 N.E.2d 364, 365–66 (Ind. 1993). We do not weigh the evidence designated by the parties but, instead, consider it liberally and in the light most favorable to the non-moving party. *See Trotter,* 684 N.E.2d at 1152. Summary judgment is appropriate only "if the designated evidentiary matter shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C), *see also Estate of Shebel v. Yaskawa Elec. Am., Inc.,* 713 N.E.2d 275, 277 (Ind.1999). The burden is on the moving party to prove the non-existence of a genuine issue of material fact. *See Mullin v. Municipal City of South Bend,* 639 N.E.2d 278, 281 (Ind.1994). If the movant sustains this burden, the opponent may not rest upon the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See* Ind. Trial Rule 56(E); *Mullin,* 639 N.E.2d at 281. If there is any doubt, the motion should be resolved in favor of the party opposing the motion. *Id.*

## II. Choice of Law

The trial court decided the case on the basis of Indiana law and ruled that any choice of law issue was not properly raised. Sword argues that the trial court erred by not using Kentucky law to decide the case. We find that any choice of law issue was not properly raised and, thus, is waived. As a result, the trial court properly applied Indiana law to this case.

Under the Uniform Judicial Notice of Foreign Law Act,[1] a party may raise a choice of law issue and may inform the trial court of the law of other states by offering evidence of such law or by asking the court to take judicial notice of such law. IND.CODE § 34–38–4–4 (1998) (formerly codified at IND.CODE § 34–3–2–4 (1993)). Providing the trial court with notice of the foreign law allows the court to consider whether the other state's or Indiana's law should apply. *See Harvest Ins. Agency, Inc. v. Inter–Ocean Ins. Co.,* 492 N.E.2d 686, 691 (Ind.1986). A prerequisite to informing the court of another state's law, however, is that "reasonable notice shall be given to the adverse parties, either in the pleadings or otherwise." IND.CODE § 34–38–4–4 (1998). In the absence of such notice to the adverse party or to the trial court, the court "will presume the law in that [other] jurisdiction is substantially the same as the law in Indiana." *Harvest,* 492 N.E.2d at 691; *see also Williams v. Graber,* 485 N.E.2d 1369, 1374–75 (Ind.Ct.App.1985). In other words, if the adverse party is not given reasonable notice that the issue of another state's law will be raised, then any choice of law question is waived and the trial court presumes that all law is the same as Indiana's. *Id.*

Here, Sword failed to give reasonable notice to Norton that Kentucky law should be applied to any of the substantive issues. Sword argues that notice was given because 1.) a sister action was pending in a Kentucky court; 2.) the details of the complaint make it clear that Kentucky law should apply; and 3.) the issue of Kentucky law was raised at the summary judgment hearing. None of these arguments are persuasive.

▬ First, the fact that an accident occurred in a state other than Indiana does not provide reasonable notice that a party will seek to use the other state's law. *See Williams,* 485 N.E.2d at 1371, 1374–75. Similarly, the fact that a sister action is pending in another state also is insufficient to provide reasonable notice within the meaning of § 34–38–4–4. The fact that plaintiff filed a sister action in Kentucky may be interpreted simply as Sword's way of "hedging her bets"—that is to say that she chose to file

---

1. Act of Mar. 9, 1937, Pub.L. No. 172, 1937 Ind.Acts 703 (codified as amended at IND.CODE §§ 34–38–4–1 to 34–38–4–7 (1998)).

actions in both states in order to enhance her chances of recovery in at least one of them.

■ To support her second argument, Sword cites to *Revlett v. Louisville & N.R. Co.*, 114 Ind.App. 187, 51 N.E.2d 95 (1943), a case where the court held that the defendant was put on notice by the plaintiff's complaint. *Id.* at 98. This case differs from *Revlett* because the complaint in *Revlett* specifically alleged that the law of Kentucky should apply and provided what the law was, whereas the complaint in the present case stated only that Norton is a Kentucky hospital and that the incident occurred in Kentucky, facts which, in and of themselves, do not provide reasonable notice. *See Williams*, 485 N.E.2d at 1371, 1374–75.

■ Finally, while it is true that Sword did indicate to the court and to Norton during the summary judgment hearing that she wished to apply Kentucky law to the agency issue,[2] this was not reasonable notice. The purpose of the notice requirement is to allow the other party time to prepare by studying the applicable law. *See generally* C.T. Drechsler, Annotation, *Uniform Judicial Notice of Foreign Law Act*, 23 A.L.R.2d 1437, 1449 (1952). By waiting until the summary judgment hearing, Sword raised a potentially strategy-altering issue without allowing Norton any opportunity to prepare. Providing notice for the first time at the summary judgment hearing, therefore, did not fulfill the purpose of the notice requirement. The trial court correctly determined that the choice of law issue was waived and correctly applied Indiana law as the presumptive law.

2. The Kentucky law that Sword wished to apply was *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255 (Ky.1985). The trial court addressed that law and distinguished it from the current case.

3. Courts holding hospitals liable under an agency theory often interchangeably describe the theory as "apparent agency" and "agency by estoppel." *See* Martin C. McWilliams, Jr. & Hamilton E. Russell, III, *Hospital Liability for Torts of Independent Contractor Physicians*, 47 S.C.L.Rev 431, 445–46 n. 76 (1996); Diane M. Janulis & Alan D. Hornstein, *Damned if You Do, Damned if You Don't: Hospitals' Liability for Physicians' Malpractice*, 64 Neb L.Rev. 689, 696 (1985). The

## III. Apparent or Ostensible Agency

The principal issue in this case is whether, under Indiana law, Norton can be held liable for the alleged negligence of an independent contractor anesthesiologist. Sword is seeking to hold Norton liable for the alleged negligence which caused her injuries. There are no allegations of direct corporate negligence, that is, that the hospital itself was negligent. Because the alleged negligence was not committed by Norton, but instead by a physician working at Norton, Sword must present a theory by which a court can find the hospital vicariously liable for the actions of a physician who practices there. After reviewing the basic tort and agency concepts relevant to theories of vicarious liability, as well as the jurisprudence in Indiana and other jurisdictions, in the specific context of this case, we adopt the theory of apparent and ostensible agency formulated in the Restatement (Second) of Torts section 429 (1965). We then conclude that there are genuine issues of material fact in dispute as to the existence of an apparent or ostensible agency relationship here.

### A. Vicarious Liability

■ Vicarious liability is "indirect legal responsibility." Black's Law Dictionary 1404 (5th ed.1979). It is a legal fiction by which a court can hold a party legally responsible for the negligence of another, not because the party did anything wrong but rather because of the party's relationship to the wrongdoer. *See* Keeton, Torts § 69. Courts employ various legal doctrines to hold people vicariously liable, including respondeat superior, apparent or ostensible agency, agency by estoppel,[3] and the non-delegable duty doctrine.[4] Some doctrines are based in

distinction, if any, is that agency by estoppel requires both reliance and a change in position. Restatement (Second) of Agency § 8 cmt. d. *See also Hope Lutheran Church v. Chellew*, 460 N.E.2d 1244, 1250–51 (Ind.Ct.App.1984).

4. While a master is generally not liable for the negligence of an independent contractor, the master may be liable if the independent contractor was performing a non-delegable duty. *See, e.g., Bagley v. Insight Communications Co.*, 658 N.E.2d 584, 586, 588 (Ind.1995); Keeton, Torts § 71. A non-delegable duty is one that public policy holds to be so important that one party should not be permitted to transfer the duty (and

tort law, some are based in agency law. Courts often discuss the various doctrines as if they are interchangeable; they are not. We will address each applicable doctrine in turn.

■ Respondeat superior is the applicable tort theory of vicarious liability. Under respondeat superior, an employer, who is not liable because of his own acts, can be held liable "for the wrongful acts of his employee which are committed within the scope of employment." *Stropes v. Heritage House Childrens Ctr.*, 547 N.E.2d 244, 247 (Ind. 1989); *see also* KEETON, TORTS §§ 69, 70; WARREN A. SEAVEY, AGENCY § 83 (1964). In this context, "employer" and "employee" are often stated in broader terms as "master" and "servant." *See Burkett v. Crulo Trucking Co.*, 171 Ind.App. 166, 180, 355 N.E.2d 253, 261 (1976); SEAVEY, AGENCY § 83.

■ One important aspect in applying respondeat superior is differentiating between those who are servants and those who are independent contractors. A servant is defined in the following general manner: one who is employed by a master to perform personal services and whose physical conduct is subject to the right to control by the master. *See* KEETON, TORTS § 70; SEAVEY, AGENCY § 84; RESTATEMENT (SECOND) OF AGENCY § 2(2) (1958). It is the employer's right to control that generally separates a servant from an independent contractor. *See* KEETON, TORTS § 71; SEAVEY, AGENCY § 84 cmt. c; RESTATEMENT (SECOND) OF AGENCY § 2 cmt. a. An independent contractor can, therefore, be defined as "a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." RESTATEMENT (SECOND) OF AGENCY § 2(3).

■ It is important to distinguish between servants and independent contractors in the tort context[5] because, while a master can be held liable for a servant's negligent conduct under respondeat superior, a master generally cannot be held liable for the negligence of an independent contractor. *See Burkett*, 355 N.E.2d at 261–62; RESTATEMENT (SECOND) OF TORTS § 409 (1965); SEAVEY, RESTATEMENT (SECOND) OF AGENCY §§ 82, 83. The theory behind non-liability for independent contractors is that it would be unfair to hold a master liable for the conduct of another when the master has no control over that conduct. *See* RESTATEMENT (SECOND) OF TORTS § 409 cmt. b.

■ Apparent agency is a doctrine based in agency law. It is most often associated with contracts and the ability of an agent with "apparent authority" to bind the principal to a contract with a third party. *See Pepkowski v. Life of Indiana Ins. Co.*, 535 N.E.2d 1164, 1166–67 (Ind.1989). Apparent authority "is the authority that a third person reasonably believes an agent to possess because of some manifestation from his principal." *Id.* at 1166; *see also* RESTATEMENT (SECOND) OF AGENCY § 8. The manifestation must be made by the principal to a third party and reasonably cause the third party to believe that an individual is an agent of the principal and to act upon that belief. *See Pepkowski*, 535 N.E.2d at 1166–67; *see also* RESTATEMENT (SECOND) OF AGENCY § 8 cmt. d. The manifestations can originate from direct or indirect communication. *Pepkowski*, 535 N.E.2d at 1167. They can also originate from advertisements to the community. RESTATEMENT (SECOND) OF AGENCY § 8 cmt. b.

In certain instances, apparent or ostensible agency also can be a means by which to

---

its resultant liability) to another party. *See Bagley*, 658 N.E.2d at 588; KEETON, TORTS § 71. Sword argues that Norton had a non-delegable duty to provide anesthesiological care because such care is essential and the patient has no choice in the anesthesiologist who provides this care. Given our resolution of the apparent or ostensible agency issue, we need not address the concept of non-delegable duty in this opinion.

5. While servants and independent contractors are different in a tort context, this is not necessarily true in an agency context. In the agency context, both a servant and an independent contractor can be an agent of the principal. *See Burkett*, 355 N.E.2d at 261; SEAVEY, AGENCY § 6; RESTATEMENT (SECOND) OF AGENCY § 2. In other words, while an independent contractor cannot be a servant, and vice versa, they can both be agents.

establish vicarious liability. One enunciation of this doctrine is set forth in the Restatement (Second) of Agency section 267, which provides that:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

(emphasis added) [hereinafter "Section 267"]. Under a Section 267 analysis, if, because of the principal's manifestations, a third party reasonably believes that in dealing with the apparent agent he is dealing with the principal's servant or agent and exposes himself to the negligent conduct because of the principal's manifestations, then the principal may be held liable for that negligent conduct. *See* RESTATEMENT (SECOND) OF AGENCY § 267 cmt. a; *see also* RESTATEMENT (SECOND) OF TORTS § 429; SEAVEY, RESTATEMENT (SECOND) OF AGENCY §§ 8 cmt. D, 90 cmt. A, 91 cmt. B.

Another similar enunciation of this doctrine is set forth in the Restatement (Second) of Torts section 429 (1965), which is captioned "Negligence in Doing Work Which is Accepted *in Reliance* on the Employer's Doing the Work Himself" and which provides:

> One who employs an independent contractor to perform services for another *which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants*, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

(emphasis added) [hereinafter "Section 429"]. Both Section 267 and Section 429 are estoppel-based. To the extent that Section 429 differs from Section 267 when applied in the hospital context, the primary difference appears to be that the reliance element is less subjective under Section 429.[6]

### B. Indiana Jurisprudence

In the hospital setting, Indiana courts have long followed the general rule that hospitals could not be held liable for the negligent actions of independent contractor physicians. In early cases, courts held that, because hospitals are corporations and corporations could not legally practice medicine, the doctrine of respondeat superior could not be applied as between hospitals and physicians, even if those physicians were employees of the hospital rather than independent contractors. *See Iterman v. Baker*, 214 Ind. 308, 316–18, 15 N.E.2d 365, 369–70 (1938); *Huber v. Protestant Deaconess Hosp. Ass'n*, 127 Ind.App. 565, 577, 133 N.E.2d 864, 869 (1956). Courts felt that respondeat superior simply did not apply because the hospitals could not legally assert any control over the physicians. *Iterman*, 15 N.E.2d at 369–70.[7]

As the Court of Appeals correctly observed, however, the holding of *Iterman* has eroded over time, and courts no longer allow hospitals to use their inability to practice medicine as a shield to protect themselves from liability. 661 N.E.2d at 14; *see also Sloan v. Metropolitan Health Council*, 516 N.E.2d 1104, 1106–09 (Ind.Ct.App.1987) (citing IND.CODE § 23–1.5–2–6(c) (1998)); *Estate of Mathes v. Ireland*, 419 N.E.2d 782, 785–86 (Ind.Ct.App.1981). Moreover, although Indiana law may support a claim of vicarious liability through apparent or ostensible agency in some instances,[8] courts in this jurisdiction rarely have considered this doctrine in a

---

6. *See generally* McWilliams, *supra* note 3, at 445–52, 457–62.

7. Some courts have distinguished between medical acts of hospital employees, which under *Iterman* cannot be imputed to the hospital, and administrative acts, which can result in hospital liability. *See, e.g., Keene v. Methodist Hosp.*, 324 F.Supp. 233, 234–35 (N.D.Ind.1971); *South Bend Osteopathic Hosp., Inc. v. Phillips*, 411 N.E.2d 387, 389–90 (Ind.Ct.App.1980).

8. *See, e.g., Hinshaw v. Board of Comm'rs*, 611 N.E.2d 637, 640 (Ind.1993); *Growcock v. Hall*, 82 Ind. 202, 203–04 (1882); *Soft Water Util., Inc. v. LeFevre*, 159 Ind.App. 529, 538–39, 308 N.E.2d 395, 399 (1974). As is true under the Restatement positions, Indiana courts have required a reliance component. *See, e.g., Growcock*, 82 Ind. at 203–04; *Soft Water*, 308 N.E.2d at 399.

hospital setting and have never applied it to hold a hospital liable for the acts of an independent contractor physician.[9] Rather, Indiana courts have continued to limit hospital liability under the doctrine of respondeat superior and have continued to focus on the question of whether the alleged acts of negligence were committed by an employee of the hospital or by an independent contractor. *See Weaver v. Robinson,* 627 N.E.2d 442, 447–48 (Ind.Ct.App.1993), *disapproved of on other grounds, Kennedy v. Murphy,* 659 N.E.2d 506 (Ind.1995); *Castillo v. Ruggiero,* 562 N.E.2d 446, 456 (Ind.Ct.App.1990). If the alleged negligence was committed by an independent contractor physician, the courts generally have held that the hospital cannot be held liable for those actions. *See, e.g., Weaver,* 627 N.E.2d at 447–48.

## C. Evolving Law in Other Jurisdictions

In the area of hospital liability, there has been an ongoing movement by courts to use apparent or ostensible agency as a means by which to hold hospitals vicariously liable for the negligence of some independent contractor physicians. *See, e.g., Clark v. Southview Hosp. & Family Health Ctr.,* 68 Ohio St.3d 435, 628 N.E.2d 46, 53 (1994) (terming it "agency by estoppel"); *Gilbert v. Sycamore Mun. Hosp.,* 156 Ill.2d 511, 190 Ill.Dec. 758, 622 N.E.2d 788, 793–94 (1993).[10] Many of these cases employ the doctrine of apparent agency when the plaintiff was negligently injured by a physician's actions while visiting the hospital's emergency room. *See Clark,* 628 N.E.2d at 53–54; *Gilbert,* 190 Ill.Dec. 758, 622 N.E.2d at 791, 796. *See generally* Abraham, *supra* note 10, at 387. Courts, however, also have employed the doctrine of apparent agency to hold a hospital liable for assertedly negligent acts committed in non-emergency room settings, including negligent acts committed by anesthesiologists. *See Seneris v. Haas,* 45 Cal.2d 811, 291 P.2d 915, 917, 926–27 (1955) (discussing negligence of an anesthesiologist during the delivery of a baby); *see also Williams v. St. Claire Med. Ctr.,* 657 S.W.2d 590, 592–93 (Ky.Ct.App. 1983) (discussing negligence of an independent contractor nurse anesthetist).[11]

Courts that have held hospitals liable for the negligence of independent contractor physicians under apparent agency have sometimes referred to or adopted Section

9. *See Hospital Corp. of Am., Inc. v. Hiland,* 547 N.E.2d 869, 874 (Ind.Ct.App.1989) (reasoning that a physician's negligence could not be imputed to the hospital under the doctrine of apparent authority when the patients had selected the physician before entering the hospital and had relied solely upon his diagnosis and recommendations, and when there was no evidence that the patients believed that the physician was an employee of the hospital or that the hospital had assumed any responsibility for their care), *adopted on other grounds in Cacdac v. Hiland,* 561 N.E.2d 758 (Ind.1990).

10. *See also Seneris v. Haas,* 45 Cal.2d 811, 291 P.2d 915 (1955); *Paintsville Hosp. Co. v. Rose,* 683 S.W.2d 255 (Ky.1985); *Grewe v. Mt. Clemens Gen. Hosp.,* 404 Mich. 240, 273 N.W.2d 429 (1978); *Kashishian v. Port,* 167 Wis.2d 24, 481 N.W.2d 277 (1992); *Pamperin v. Trinity Mem'l Hosp.,* 144 Wis.2d 188, 423 N.W.2d 848 (1988); *Sharsmith v. Hill,* 764 P.2d 667 (Wyo.1988). *See generally* Martin C. McWilliams, Jr. and Hamilton E. Russell, III, *Hospital Liability for Torts of Independent Contractor Physicians,* 47 S.C.L.Rev. 431 (1996); Kenneth S. Abraham and Paul C. Weiler, *Enterprise Medical Liability and the Evolution of the American Health Care System,* 108 Harv L.Rev. 381, 386–89 (1994); Diane M. Janulis and Alan D. Hornstein, *Damned if You Do, Damned if You Don't: Hospitals' Liability for Physician Malpractice,* 64 Neb.L.Rev. 689 (1985).

11. *See also Kashishian,* 481 N.W.2d at 278 (discussing negligence of a cardiologist arising out of a cardiology consultation). *See generally* Abraham, *supra* note 10, at 388 (noting that patients are certainly under the impression that it is the hospital and not the individual physicians that provides such services as emergency, radiology, and anesthesiology, and that patients have maintained successful apparent agency suits against hospitals for the acts of emergency room physicians, anesthesiologists, pathologists, and radiologists); Janulis, *supra* note 10, at 693 (explaining that hospitals often execute exclusive service contracts with groups of independent contractor physicians to staff areas such as radiology, pathology, and emergency room services and that consequently patients' ability to select physicians becomes limited by the restriction of clinical practice to the contracting physicians); McWilliams, *supra* note 10, 437 (explaining that hospitals try to utilize the doctrine of respondeat superior to insulate themselves or limit their liability by utilizing independent contractors in many high-risk specialties such as radiology, pathology, anesthesiology, and emergency room services).

267,[12] Section 429,[13] or both,[14] and sometimes have not referred to or adopted either Section 267 or Section 429.[15] While the language employed by these courts sometimes varies, generally they have employed tests which focus primarily on two basic factors. The first factor focuses on the hospital's manifestations and is sometimes described as an inquiry whether the hospital "acted in a manner which would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital." *Kashishian*, 481 N.W.2d at 284–85; *Gilbert*, 190 Ill.Dec. 758, 622 N.E.2d at 795–96 (quoting *Pamperin v. Trinity Mem'l Hosp.*, 144 Wis.2d 188, 423 N.W.2d 848, 855–56 (1988)); *see also Seneris*, 291 P.2d at 927. Courts considering this factor often ask whether the hospital "held itself out" to the public as a provider of hospital care, for example, by mounting extensive advertising campaigns. *See, e.g., Clark*, 628 N.E.2d at 53; *Gilbert*, 190 Ill.Dec. 758, 622 N.E.2d at 796. In this regard, the hospital need not make express representations to the patient that the treating physician is an employee of the hospital; rather a representation also may be general and implied. *See, e.g., Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 256 (Ky.1985); *Pamperin v. Trinity Mem'l Hosp.*, 144 Wis.2d 188, 423 N.W.2d 848, 856 (1988) (presuming that the hospital held itself out as a medical care provider unless the hospital expressly provided notice to the patient that independent contractors provide the care).

The second factor focuses on the patient's reliance. It is sometimes characterized as an inquiry as to whether "the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence." *Kashishian*, 481 N.W.2d at 285; *Gilbert*, 190 Ill.Dec. 758, 622 N.E.2d at 795 (quoting *Pamperin*, 423 N.W.2d at 855–56); *see also Seneris*, 291 P.2d at 927. Courts

considering this factor sometimes ask whether, because of the hospital's manifestations, the plaintiff believed that the hospital was providing the pertinent medical care as opposed to simply acting as a situs for the physician to provide health care as an independent contractor. *See, e.g., Clark*, 628 N.E.2d at 53; *Gilbert*, 190 Ill.Dec. 758, 622 N.E.2d at 796; *Kashishian*, 481 N.W.2d at 285. Other courts, however, seem to employ a less subjective form of reliance or even to presume reliance absent any evidence that the patient knew or should have known that the physician was not an employee of the hospital and that it is the physician and not the hospital who is responsible for his medical care. *See, e.g., Seneris*, 291 P.2d at 927; *Paintsville Hosp.*, 683 S.W.2d at 257–58; *Williams*, 657 S.W.2d at 596; *Arthur v. St. Peters Hosp.*, 169 N.J.Super. 575, 405 A.2d 443, 447 (1979). An example of a situation where a patient might be in a position to know that the physician was an independent contractor may exist if the patient establishes an independent relationship with the physician or selects a particular physician in advance of going to the hospital. *See Arthur*, 405 A.2d at 447. Even in such circumstances, however, the courts have reasoned that the patient may not have had reason to know of the contractual arrangements between the physician and the hospital. *See, e.g., Kashishian*, 481 N.W.2d at 284.

Central to both of these factors—that is, the hospital's manifestations and the patient's reliance—is the question of whether the hospital provided notice to the patient that the treating physician was an independent contractor and not an employee of the hospital. *See, e.g., Seneris*, 291 P.2d at 927; *Gilbert*, 190 Ill.Dec. 758, 622 N.E.2d at 796; *Clark*, 628 N.E.2d at 53; *Pamperin*, 423 N.W.2d at 856–57; *Kashishian*, 481 N.W.2d at 286.

12. *See, e.g., Paintsville Hosp. Co.*, 683 S.W.2d at 257.

13. *See, e.g., Arthur v. St. Peters Hosp.*, 169 N.J.Super. 575, 405 A.2d 443, 446 (1979).

14. *See, e.g., Sharsmith v. Hill*, 764 P.2d 667, 672 (Wyo.1988).

15. *See, e.g., Gilbert v. Sycamore Mun. Hosp.*, 156 Ill.2d 511, 190 Ill.Dec. 758, 622 N.E.2d 788 (1993); *Grewe v. Mt. Clemens Gen. Hosp.*, 404 Mich. 240, 273 N.W.2d 429 (1978); *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 628 N.E.2d 46 (1994); *Kashishian*, 167 Wis.2d 24, 481 N.W.2d 277 (1992).

### D. Adoption of Restatement (Second) of Torts Section 429

In the present case, Sword argues that, under the doctrine of apparent or ostensible agency, Norton is vicariously liable for the actions of its apparent agent Dr. Luna, whom the parties agree was an independent contractor. The Court of Appeals held that Dr. Luna could be an apparent agent of Norton, and that there were genuine issues of material fact in dispute on this question. The Court of Appeals, however, reached this conclusion by looking to Indiana jurisprudence which, to date, had not clearly defined a test for determining apparent agency in the hospital context and which had not adopted either Restatement position. The Court of Appeals invited us to consider the appropriateness of more clearly defining a test and adopting one of the two formulations of the test set forth in the Restatements. *Sword,* 661 N.E.2d at 15 n. 2. We agree with the conclusion of the Court of Appeals and now, in the specific context of a hospital setting, expressly adopt the formulation of apparent or ostensible agency set forth in the Restatement (Second) of Tort section 429.

■■■ Under Section 429, as we read and construe it, a trier of fact must focus on the reasonableness of the patient's belief that the hospital or its employees were rendering health care. This ultimate determination is made by considering the totality of the circumstances, including the actions or inactions of the hospital, as well as any special knowledge the patient may have about the hospital's arrangements with its physicians. We conclude that a hospital will be deemed to have held itself out as the provider of care unless it gives notice to the patient that it is not the provider of care and that the care is provided by a physician who is an independent contractor and not subject to the control and supervision of the hospital. A hospital generally will be able to avoid liability by providing meaningful written notice to the patient, acknowledged at the time of admission. *See Cantrell v. Northeast Georgia Med. Ctr.,* 235 Ga.App. 365, 508 S.E.2d 716, 719–20 (1998) (concluding that hospital did not hold physician out as its employee as evidenced by conspicuous signs posted in hospital's registration area and express language in the patient consent to treatment form); *Valdez v. Pasadena Healthcare Management, Inc.,* 975 S.W.2d 43, 48 (Tex.App. 1998) (finding written notice, signed by the patient, that physician served as an independent contractor was sufficient to release hospital from liability for physician's medical malpractice). Under some circumstances, such as in the case of a medical emergency, however, written notice may not suffice if the patient had an inadequate opportunity to make an informed choice.

■■■ As to the meaning and importance of reliance in this specific context, we agree with the cases that hold that if the hospital has failed to give meaningful notice, if the patient has no special knowledge regarding the arrangement the hospital has made with its physicians, and if there is no reason that the patient should have known of these employment relationships, then reliance is presumed. *See Seneris,* 291 P.2d at 927; *Paintsville,* 683 S.W.2d at 257–58; *Williams,* 657 S.W.2d at 596; *Arthur,* 405 A.2d at 447.

■■■ Applying this test here, we conclude that there are genuine material issues of fact in dispute as to whether Dr. Luna was an apparent or ostensible agent of Norton and whether Norton may be held liable for any of Dr. Luna's asserted negligent acts. First, there is nothing in this record which indicates that the hospital did anything to put plaintiff on notice that it was her physician, an independent contractor, who was responsible for her medical care and not the hospital.[16] Second, this is clearly not a case

---

16. In a deposition colloquy, counsel made a general reference to a document titled "Condition of Admission and Authorization for Treatment," which assertedly informed plaintiff that her physician is not an employee of the hospital, and that the hospital is not liable for any acts of the practicing physician. That document, however, is not in the record, and no witness testified regarding that document. Nevertheless, even assuming the accuracy of counsel's representations during this colloquy, it is far from clear that this document would constitute sufficient notice of the relationship between the hospital and the physician within the meaning of the rule we articulate today. In fact, it is likely insufficient notice if it is the sole source of notice and if

 

where plaintiff selected her own anesthesiologist prior to admission, for she specifically testified that she did not know who would administer the epidural until just before the procedure, and if she had any special knowledge of the hospital's employment arrangement with Dr. Luna or with the hospital's general employment practices with respect to physicians, it is not apparent on this record. Finally, Norton held itself out, through an extensive advertising campaign, as a full-service hospital which specializes in obstetric care.

Based on this record and under Section 429 as we construe it today, there are clearly genuine issues of material fact as to whether Dr. Luna is an apparent agent of Norton. The trial court erred when it entered summary judgment for defendant on this issue.

### IV. Causation

 Plaintiff also challenges the trial court's finding that the affidavits included in the record are insufficient to create a material issue of fact as to causation. Plaintiff submitted an affidavit by Dr. Davidson who simply testified that, in his opinion, Dr. Luna's care fell below the standard of care required by physicians administering an epidural. Plaintiff also submitted an affidavit by Dr. Milan, which states that: "Plaintiff's symptoms of low back pain and headaches are consistent with the loss of spinal fluid which accompanied the insertion of the epidural in the cervical region of the Plaintiff's back." (R. at 100.) Defendant argues that the doctors' affidavit testimony does not establish that there is a material issue of fact as to causation. In particular, defendant points to the fact that Dr. Milan states only that her injuries are "consistent with" a loss a spinal fluid and not that the loss of spinal fluid "caused" her injuries. *Id.* While the doctors' affidavits do not expressly state that Dr. Luna's negligence caused plaintiff's injuries, a reasonable jury certainly could infer and conclude based on this testimony that her injuries resulted from an improperly administered epidural. Because under the applicable standard of review, every inference must be resolved in favor of plaintiff, we

agree with the conclusion reached by the Court of Appeals. There is a genuine issue of material fact as to whether Dr. Luna caused plaintiff's injuries, and the trial court erred by granting summary judgment for defendant on this issue.

### CONCLUSION

Accordingly, we affirm that portion of the trial court's decision which ruled that Indiana law applies, but reverse the trial court's grant of summary judgment for defendant on the apparent agency and causation issues. We remand to the Clark Circuit Court for further proceedings not inconsistent with this opinion.

SHEPARD, C.J., and DICKSON, SULLIVAN, and BOEHM, JJ., concur.

plaintiff did not read or sign that form until she

arrived at the hospital in active labor.